IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

VIDEOLABS, INC. and VL COLLECTIVE
IP LLC,

                 Plaintiffs,

    v.

NETFLIX, INC.

                 Defendant.

CIVIL ACTION
NO.  22-229

## OPINION

**Slomsky, J.**                                            **May 14, 2024**

## I.    INTRODUCTION

On May 6, 2022, Plaintiffs VideoLabs, Inc. and VL Collective IP LLC ("Plaintiffs" or "VideoLabs")[1] filed an Amended Complaint against Defendant Netflix, Inc. ("Defendant" or "Netflix") alleging patent infringement, in violation of 35 U.S.C. § 271(a).[2]  (Doc. No. 11.) Plaintiffs allege that Defendant infringed four patents: (1) United States Patent No. 8,139,878 ("the '878 Patent") (Count I), (2) United States Patent No. 7,440,559 ("the '559 Patent") (Count II), (3) United States Patent No. 7,233,790 ("the '790 Patent") (Count III), and United States Patent No. 8,605,794 ("the '794 Patent") (Count IV).  (See id.)

---

[1]    VL Collective IP LLC was founded in 2019 as a subsidiary of VideoLabs, Inc.  (Doc. No. 11 at ¶ 14.)  The Court will refer to both Plaintiffs collectively as VideoLabs.

[2]    35 U.S.C. § 271(a) provides:

> Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent.

On June 10, 2022, Defendant filed a Partial Motion to Dismiss the Amended Complaint (Doc. No. 15) and an Opening Brief in Support of its Partial Motion (Doc. No. 16).  Defendant asserts that Counts II to IV of the Amended Complaint should be dismissed because the '559, '790, and '794 Patents concern ineligible subject matter under 35 U.S.C. § 101.[3]  (See Doc. No. 15)  Defendant also moves under Federal Rule of Civil Procedure 12(b)(6) to dismiss Plaintiffs' claims for indirect and willful infringement present in the infringement claims in all four (4) Counts.[4]  (See id.)

On June 24, 2022, Plaintiffs filed a Response to the Partial Motion to Dismiss the Amended Complaint (Doc. No. 18), and on July 1, 2022, Defendant filed a Reply (Doc. No. 19).  On January 27, 2023, Plaintiffs filed a Notice of Subsequent Authority and Events.  (Doc. No. 30.)  On February 8, 2023, Plaintiffs filed another Notice of a Subsequent Event.  (Doc. No. 33.)  On February 9, 2023, Defendant filed a Response to Plaintiffs' Notice of a Subsequent Event.  (Doc. No. 34.)  On the same day, a hearing was held on the Partial Motion.  (Doc. No. 35.)  Defendant's Partial Motion to Dismiss the Amended Complaint is now ripe for disposition.  For the reasons that follow, Defendant's Partial Motion to Dismiss the Amended Complaint (Doc. No. 15) will be denied.

---

[3]   35 U.S.C. § 101 provides:

> Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

[4]   Although the claims for indirect and willful infringement, which are alleged in all four (4) Counts, are being challenged, even if these claims were dismissed, the underlying patent infringement claims would still remain.

## II.    BACKGROUND

VideoLabs is a corporation that seeks to "reduce the cost and risk of technological gridlock associated with diverse patent ownership." (Doc. No. 11 at ¶ 12.) The founders of VideoLabs believe that because various companies played a role in developing the foundational technology for today's digital video, no single company is able to provide a high-quality video experience on its own. (Id. at ¶ 4.) To solve this problem, VideoLabs acquired the rights to patents in video technologies and compiled a portfolio of patents obtained from companies such as Hewlett Packard Enterprise, Siemens AG, and Panasonic. (Id. at ¶ 6.) VideoLabs then created a platform where, in exchange for a membership or licensing fee, companies could gain access to VideoLabs' patent portfolio. (Id. at ¶ 7.)

Defendant Netflix is a publicly traded corporation in the entertainment services industry. (Id. at ¶ 16.) Defendant operates a streaming service that provides customers with digital video content. (Id. at ¶ 8.) Defendant is not a member of VideoLabs' platform. (Id.)

As noted, on May 6, 2022, Plaintiffs filed an Amended Complaint alleging Defendant infringed four (4) of their patents. (Doc. No. 11.) On June 10, 2022, Defendant filed the Partial Motion to Dismiss the Amended Complaint. (Doc. No. 15.) At issue in Defendant's Partial Motion to Dismiss are three VideoLab patents, which are described below. The Court will address each of these Patents in the order that they are discussed by the parties.

## A. The '790 Patent[5]

The '790 Patent covers the providing of access to digital content for use on a wireless communication device.  (Doc. No. 11 at ¶ 162.)  The television and entertainment industry has been highly impacted by the rise of video-on-demand and streaming services like Netflix.  (Id. at ¶ 51.)  These services allow users to conveniently stream video content over the Internet at any time and in any place.  (Id.)  Today, many customers access video content on their mobile devices. (Id.)

At the time streaming services became popularized, however, delivering digital media to several mobile devices presented technical challenges.  (Id. at ¶ 52.)  As the technology behind cellular and wireless networks advanced, traditional content delivery techniques became incapable of meeting modern needs.  (Id.)  That is because previous techniques "were rooted in the nature of [] old technologies, in which content was prepared and packaged once, for distribution over a traditional broadcast medium and in a singular, conventional broadcast format."  (Id. at ¶ 53.)  In other words, traditional broadcasting required content to be delivered one time to all viewers, while modern streaming services require content to be delivered multiple times to each viewer.  "From a content supplier's perspective, an impediment to the efficient distribution of digital content was the fact that different [] devices often required different content packaging formats and provisioning protocols."  (Id.)  Therefore, in order for a content supplier to deliver digital content to multiple devices, the supplier would "normally have to deploy that item of content multiple times, packaging it differently for each of the provisioning models."  (Id.)  The need to package

---

[5]   The '790 Patent was issued on June 19, 2007 and is titled "Device Capability Based Discovery, Packaging and Provisioning of Content for Wireless Mobile Devices."  (Doc. No. 11 at ¶ 49.) The original assignee of the '790 Patent is Openwave Systems, Inc. ("Openwave").  (Id. at ¶ 50.)  VideoLabs currently owns all rights and title to the '790 Patent.  (Id. at ¶ 49.)

digital content in a manner suitable to all of the devices in the marketplace was "very burdensome" on content suppliers.  (Id.)

The '790 Patent addresses this problem.  (Id. at ¶ 54.)  The '790 Patent presents a "method and apparatus for providing access to content for use on wireless communication devices."  (Doc. No. 11-21 at 18.)  The '790 Patent describes a method where multiple items of content are stored in a server system.  (Id.)  Each item of content is associated in the server system with multiple different models that package the content to different wireless devices based on different device capabilities.  (Id.)  These models are then stored in a content library, which "leav[es] to the device the choice of which implementation version of content to obtain from the service."  (Doc. No. 11 at ¶ 54.)

In the '790 Patent, "product information is separated from the content itself, the content is separated from how it is packaged for delivery, the packaged content is separated from the delivery mechanism, and the delivery mechanism is separated from the discovery mechanism."  (Id.)  By virtue of this separation, "a content supplier can deploy content only once, targeting a wide range of provisioning protocols."  (Id.)  In simple terms, the '790 Patent is separating content from the content delivery mechanism to improve the efficiency of delivering content to wireless devices that have varying device capabilities.

Claim 2 of the '790 Patent describes the innovation as:

A method of providing access to digital content for use on wireless communication devices, the method comprising:

receiving and storing in a server system a plurality of items of digital content to be made available for use in wireless communication devices used by a plurality of wireless services subscribers, including receiving and storing a plurality of different implementations of at least one of the items of digital content, where each implementation of any given item of digital content corresponds to a different set of device capabilities;

operating the server system to maintain a product catalog containing a description of the items of digital content, wherein the product catalog includes, in association with each item of digital content, a reference to each implementation of said item of digital content;

receiving a request from a wireless device used by one of the subscribers;

in response to the request, selecting a portion of the product catalog to be presented to the subscriber, based on device capabilities of the wireless device used by the subscriber; and

presenting the selected portion of the product catalog to the subscriber via a wireless network, such that the selected portion, as presented to the subscriber, provides only a single description of each item of digital content in said portion, regardless of the number of implementations of each said item.

(Id. at ¶ 162.)

## B.  The '559 Patent[6]

The '559 Patent relates to the control of the flow of content from a server to a terminal.  As mentioned above, advances in the technology of cellular and wireless networks posed new challenges for content streaming.  One such challenge was that it was difficult to handle data-intensive tasks like delivering high-quality video content on mobile networks.  (Id. at ¶ 46.)  In response to this challenge, "alternative broadband delivery techniques were being investigated to support the delivery of data-intensive content."  (Id.)  At the time, "mobile terminals would typically download content by 'pulling' it from a server."  (Id. at ¶ 47.)  This technique "was rooted in the industry's established habits, which ignored input from the devices consuming the content."  (Id.)  In other words, user devices were unable to communicate information about their device capabilities to content providers.  This technique was therefore "outdated," "inefficient and undesirable."  (Id.)

---

[6]   The '559 Patent was issued on October 21, 2008 and is titled "System and Associated Terminal, Method and Computer Program Product for Controlling the Flow of Content."  (Doc. No. 1 at ¶ 43.)  The original assignee of the '559 Patent is Nokia Corporation.  (Id. at ¶ 44.) VideoLabs currently owns all rights and title to the '559 Patent.  (Id. at ¶ 43.)

The '559 Patent addresses this problem by bridging the informational disconnect between user devices and content providers.  The '559 Patent describes "[a] system for controlling [the] flow of content includ[ing] a terminal and a network entity."  (Doc. No. 11-18 at 2.)  The terminal is capable of sending a content request that includes terminal status information.  (Id. at 8.) Terminal status information can include information regarding the terminal that describes user preferences, the capabilities of the terminal, and other content stored by the terminal.  (Id. at 9.) The network entity, such as a digital broadcast receiver, can then control the flow of content to the terminal based upon the terminal status information.  (Id. at 8.)  The network entity also includes a content flow manager that is capable of receiving the terminal status information.  "Thus, in contrast to conventional techniques for downloading content to a terminal, the network entity can control the flow of content to the terminal based upon information that accounts for user preferences, capabilities of the terminal and/or previous contents stored by the terminal."  (Id. at 9.)

Claim 1 of the '559 Patent describes the innovation as:

An apparatus comprising:

a processor configured to receive, from a terminal located remote from the apparatus, a content status including terminal status information, and configured to receive server status information regarding a source of content, wherein the server status information comprises a listing of at least one piece of content available from the source, wherein the processor is configured to send, to the terminal, a response to the content status that instructs the terminal to perform one or more actions to thereby control the flow of content to the terminal based upon the terminal status information and the server status information, and

wherein the at least one piece of content available from the source, and the content for which the processor is configured to control the flow, comprise multimedia content.

(Id. at ¶ 126.)

C. **The '794 Patent**[7]

The '794 Patent covers the ordering of audio within digital video content.  Prior to the infiltration of streaming services, content was primarily distributed using television signals and customers received the same content, encoded in the same way, and at the same time.  (Id. at ¶ 57.) That changed following the increase in Internet access and improved network speeds and technologies.  (Id. at ¶ 58.)  Content began being transmitted over the Internet to many different types of devices, including mobile phones, desktop computers, and laptops, which posed challenges to the delivery of content.  (Id.)  The fact that devices vary in their strength of Internet connection also posed a challenge for the transmission of content to mobile phones.  (Id. at ¶ 59.)

These challenges called for new techniques to be developed for managing and processing audiovisual content.  (Id. at ¶ 61.)  "Content was no longer stored as a single file in a single location" and instead audio and visual data attached to digital content "was broken up into numerous 'segments' that might be stored on various Internet servers."  (Id.)  "Prior to the '794 Patent, however, there was not a suitable method for aligning the various audio and video segments that comprised a piece of content."  (Id. at ¶ 62.)  Previous techniques would align audio segments by using timestamp information stored in each segment.  (Id. at ¶ 63.)  "Essentially, each segment [would] include[] metadata indicating when in the timeline of the content the segment should be played."  (Id.)  This technique had several shortcomings such as viewers being unable to selectively play different parts of the content.  (Id.)

---

[7]   The '794 Patent was issued on December 10, 2013 and is titled "Method for Synchronizing Content-Dependent Data Segments of Files."  (Doc. No. 1 at ¶ 55.)  The original assignee of the '559 Patent is Siemens Aktiengesellschaft ("Siemens").  (Id. at ¶ 56.)  VideoLabs currently owns all rights and title to the '794 Patent.  (Id. at ¶ 55.)

The '794 Patent remedies these problems and improves upon these timestamp-based techniques. (<u>Id.</u> at ¶ 64.)  The '794 Patent describes a technique "in which segments are ordered chronologically and aligned with corresponding segments . . . using predefined assignment rules." (<u>Id.</u>)  These assignments rules are not based on timestamps and instead "they flexibly permit the alignment of segments using rules appropriate for different contexts."  (<u>Id.</u>)  Claim 1 of the '794 Patent describes the innovation as:

> A method for synchronizing content-related first data segments of a first data file and content-related second data segments of a second data file, the method comprising:
>
> sequentially outputting, by a device for synchronizing content-related data, the content-related first data segments and the content-related second data segments according to their chronological sequence in such a way that each of the content-related second data segments is output together with an associated one of the content-related first data segments on the basis of an assignment rule for
>
> assigning each one of the content-related second data segments to one of the content-related first data segments.

(<u>Id.</u> at ¶ 191.)

## III.    STANDARD OF REVIEW

Under Rule 12(b)(6), a party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  To survive the motion to dismiss, the complaint need not contain "detailed factual allegations," but it must contain sufficient factual matter to "state a claim to relief that is plausible on its face."  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting <u>Bell Atl. Corp v. Twombly</u>, 550 U.S. 544, 555, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).  In assessing the plausibility of a claim, a court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  <u>In re Rockefeller Ctr. Prop., Inc. Sec. Litig.</u>, 311 F.3d 198, 215 (3d Cir. 2002).  A court's review is limited to the allegations in the complaint, exhibits attached to

the complaint, and documents incorporated by reference.  Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010); El-Hewie v. Bergen Cty., 348 F. App'x 790, 794 (3d Cir. 2009).

It is well-settled that courts may determine patent eligibility under 35 U.S.C. § 101 at the Rule 12(b)(6) stage.  SAP Am., Inc. v. InvestPic, LLC, 898 F.3d 1161, 1166 (Fed. Cir. 2018) (stating that patent eligibility "may be, and frequently has been, resolved on a Rule 12(b)(6) or (c) motion"); FairWarning IP, LLC v. Iatric Sys., Inc., 839 F.3d 1089, 1097 (Fed. Cir. 2016) (stating that "it is possible and proper to determine patent eligibility under 35 U.S.C. § 101 on a Rule 12(b)(6) motion" (quoting Genetic Techs. Ltd. v. Merial L.L.C., 818 F.3d 1369, 1373–74 (Fed. Cir. 2016)); see also Voter Verified, Inc. v. Election Sys. & Software LLC, 887 F.3d 1376, 1379 (Fed. Cir. 2018) (affirming Rule 12(b)(6) dismissal based on § 101 patent ineligibility); Maxon, LLC v. Funai Corp., 726 F. App'x 797, 798 (Fed. Cir. 2018) (same).  Determining eligibility at the pleadings stage is possible, however, "only when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law."  Aatrix Software, Inc. v. Green Shades Software, Inc., 882 F.3d 1121, 1125 (Fed. Cir. 2018).

As noted, Section 101 of the Patent Act provides that anyone who "invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof" may obtain a patent.  See 35 U.S.C. § 101.  The United States Supreme Court has recognized three exceptions to the broad categories of subject matter eligible for patenting under § 101: laws of nature, physical phenomena, and abstract ideas.  Alice Corp. Pty. v. CLS Bank Int'l, 573 U.S. 208, 216 (2014).  These exceptions "are 'the basic tools of scientific and technological work' that lie beyond the domain of patent protection."  Ass'n for Molecular Pathology v. Myriad Genetics, Inc., 569 U.S. 576, 589 (2013) (quoting Mayo Collaborative Servs. v. Prometheus Labs., Inc., 566 U.S. 66, 77-78 (2012)); see also Alice, 573

U.S. at 216.  A claim falling within any one of these exceptions is directed to ineligible subject matter under § 101.  "[W]hether a claim recites patent eligible subject matter is a question of law which may contain underlying facts."  Berkheimer v. HP Inc., 881 F.3d 1360, 1368 (Fed. Cir. 2018).

Courts follow a two-step "framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts."  Alice, 573 U.S. at 217; see also Mayo, 566 U.S. at 77-78.  First, at step one, the Court determines whether the claims are directed to one of the three patent-ineligible concepts.  Alice, 573 U.S. at 217.  If the claims are not directed to a patent-ineligible concept, "the claims satisfy § 101 and [the Court] need not proceed to the second step."  Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc., 880 F.3d 1356, 1361 (Fed. Cir. 2018).  If, however, the Court finds that the claims at issue are directed to a patent-ineligible concept, the Court must then, at step two, search for an "inventive concept" – i.e., "an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'"  Alice, 573 U.S. at 217-18 (alteration in original) (quoting Mayo, 566 U.S. at 72-73). These two steps are discussed in more detail below.

### D.  Step One of the Alice Framework

At step one of Alice, "the claims are considered in their entirety to ascertain whether their character as a whole is directed to excluded subject matter."  Internet Patents Corp. v. Active Network, Inc., 790 F.3d 1343, 1346 (Fed. Cir. 2015); see also Affinity Labs of Texas, LLC v. DIRECTV, LLC, 838 F.3d 1253, 1257 (Fed. Cir. 2016) (step one looks at the "focus of the claimed advance over the prior art" to determine if the claim's "character as a whole" is to ineligible subject matter).  "This 'directed to' inquiry does more than 'simply ask whether the claims involve a

patent-ineligible concept'…Instead, we must look to the character of the claims as a whole to determine whether they are 'directed to' patent-ineligible subject matter." AI Visualize, Inc. v. Nuance Commc'ns, Inc., No. 2022-2109, 2024 WL 1449801, at *5 (Fed. Cir. Apr. 4, 2024) (citing Enfish, LLC v. Microsoft Corp., 822 F.3d 1327, 1335 (Fed. Cir. 2016)).  In addressing step one of Alice, a court should be careful not to oversimplify the claims or the claimed invention because, at some level, all inventions are based upon or touch on abstract ideas, natural phenomena, or laws of nature.  Alice, 573 U.S. at 217; see also McRO, Inc. v. Bandai Namco Games Am. Inc., 837 F.3d 1299, 1313 (Fed. Cir. 2016).  "At step one, therefore, it is not enough to merely identify a patent-ineligible concept underlying the claim; [courts] must determine whether that patent-ineligible concept is what the claim is 'directed to.'" Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc., 827 F.3d 1042, 1050 (Fed. Cir. 2016).

### E.  Step Two of the Alice Framework

At step two of Alice, in searching for an inventive concept, a court looks at the claim elements and their combination to determine if they transform the ineligible concept into something "significantly more." Alice, 573 U.S. at 218; see also McRO, 837 F.3d at 1312.  This second step is satisfied when the claim elements "involve more than performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'" Berkheimer, 881 F.3d at 1367 (citation and internal quotation marks omitted); see also Mayo, 566 U.S. at 73.  "The inventive concept inquiry requires more than recognizing that each claim element, by itself, was known in the art. . . . [A]n inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC, 827 F.3d 1341, 1350 (Fed. Cir. 2016).  Whether claim elements or their combination are well-understood, routine, or conventional to a person of ordinary skill in the art is a question

of fact.  Berkheimer, 881 F.3d at 1368.  Further, "[a] claim cannot rest on the patent-ineligible concept alone to transform the invention into something significantly more than that concept."  AI Visualize, 2024 WL 1449801, at *5 (citing BSG Tech LLC v. Buyseasons, Inc., 899 F.3d 1281, 1290 (Fed. Cir. 2018)).

At both steps of the Alice framework, courts often find it useful "to compare the claims at issue with claims that have been considered in the now considerably large body of decisions applying § 101."  TMI Sols. LLC v. Bath & Body Works Direct, Inc., No. 17-965-LPS-CJB, 2018 WL 4660370, at *5 (D. Del. Sept. 28, 2018) (citing Amdocs (Israel) Ltd. v. Openet Telecom, Inc., 841 F.3d 1288, 1294 (Fed. Cir. 2016)); see also Enfish, LLC v. Microsoft Corp., 822 F.3d 1327, 1334 (Fed. Cir. 2016).

## IV.   ANALYSIS

### A.  The '790 Patent is Eligible for Protection Under 35 U.S.C. § 101

In its Partial Motion to Dismiss the Amended Complaint, Defendant argues that the '790 Patent is unpatentable because it fails under both steps of Alice.  (Doc. No. 16 at 18-20.)  First, Defendant argues that the '790 Patent is ineligible for patent protection under step one of Alice because it is directed to the abstract idea of "cataloging content and tailoring content based on device capabilities."  (Id. at 18.)  Second, Defendant argues that the '790 Patent is ineligible for patent protection under step two of Alice because it does not contain an inventive concept.  (Id. at 19.)

Plaintiffs argue to the contrary that the '790 Patent is eligible for patent protection under both Alice steps.  (Doc. No. 18 at 9-14.)  First, Plaintiffs argue that the '790 Patent is not abstract because it provides a computer-specific improvement that provides a "patentable solution to inefficient, slow, and ineffective delivery of digital content to wireless subscribers."  (Id. at 9.)

13

Second, even if the '790 Patent is abstract, it nevertheless deserves patent protection because it recites an inventive concept by providing a "specific technical solution beyond simply using generic computer concepts in a conventional way."  (Id. at 13) (citing Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC, 827 F.3d 1341, 1351 (Fed. Cir. 2016)).

As noted above, to assess whether a claim is patent-eligible, courts engage under Alice in a two-step analysis.  Regarding the first step of the Alice framework, the relevant question is whether the claims are directed to patent-ineligible subject matter.  Here, the relevant inquiry is whether the claims in the '790 Patent are directed to an abstract idea.

Defendant argues that the '790 Patent is directed to the abstract idea of cataloging content and tailoring content based on device capabilities.  (Doc. No. 16 at 18.)  In support of this argument, Defendant relies on Affinity Labs of Texas, LLC v. Amazon.com, Inc., where a court held that the "tailoring of content based on information about the user . . . is an abstract idea that is as old as providing different newspaper inserts for different neighborhoods."  (Id.) (quoting Affinity Labs of Texas, LLC v. Amazon.com, Inc., 838 F.3d 1266, 1271 (Fed. Cir. 2016)).  In Affinity Labs, the claim at issue recited a "a network based media managing system that maintain[ed] a library of content that a given user has a right to access and a customized user interface page for the given user."  Affinity Labs of Texas, LLC, 838 F.3d at 1267.  There, the court explained that "like the basic concept of tailoring content to a user . . . the basic concept of customizing a user interface is an abstract idea."  Id. at 1271.

Here, Defendant reasons that Claim 2 of the '790 Patent is analogous to the one in Affinity Labs because it similarly tailors content to a user.  (Doc. No. 16 at 19.)  However, the '790 Patent is distinguishable from the one in Affinity Labs because Claim 2 of the '790 Patent describes a mechanism for tailoring content based on device capabilities and does not customize content to a

user.   As Plaintiffs describe, "[C]laim 2 makes a selection based on device capabilities, not user information, constituting an improvement to the computing system that allows the system to perform more efficiently, effectively, and automatically."  (Doc. No. 18 at 11.)

Further, courts have held that claims that solve technological problems in computer network operations are not abstract.  SRI Int'l, Inc. v. Cisco Sys., Inc., 930 F.3d 1295, 1304 (Fed. Cir. 2019).  In SRI, the court held that "claims that actually prevent the normal, expected operation of a conventional computer network" and "technology that overrides the routine and conventional sequence of events" is not abstract.  Here, Plaintiffs have sufficiently pled that the '790 Patent overrides the routine and conventional sequence of events by "storing and distributing multiple items of digital content in multiple provisioning and packaging formats from one server system." (Doc. No. 18 at 13.)  This process is in "contrast [to] a normal computer network, which separately and multiply procures and deploys different implementations of digital content."  (Id.)  For these reasons, Claim 2 of the '790 Patent satisfies step one of the Alice framework and is patent-eligible.

As noted above, because Claim 2 of the '790 Patent is not directed to patent-ineligible subject matter and satisfies the first step in the Alice framework, the Court need not reach the second step.  See Core Wireless 15 Licensing S.A.R.L. v. LG Elecs., Inc., 880 F.3d 1356, 1361 (Fed. Cir. 2018).   Therefore, Defendant's Partial Motion to Dismiss Count III relating to the '790 Patent will be denied.

### B.  The '559 Patent is Eligible for Protection Under 35 U.S.C. § 101

Next, Defendant argues that the '559 Patent is unpatentable because it fails under both steps of Alice.  (Doc. No. 16 at 21-23.)  First, Defendant claims that the '559 Patent is ineligible for patent protection under step one of Alice because it is directed to the abstract idea of controlling the flow of data.  (Id. at 21.)  Second, Defendant argues that the '559 Patent is ineligible for patent protection under step two of Alice because it "recites a generic processor and server as performing

15

the claimed functions, without claiming any improvements to those known components or any ways to achieve the result." (Id. at 22.)

Plaintiffs disagree, arguing that the '559 Patent is eligible for patent protection under both Alice steps. (Doc. No. 18 at 16-20.)  First, Plaintiffs assert that the '559 Patent is not an abstract idea because it "embodies a novel network architecture that improves the functioning of computers." (Id. at 17.)  Second, even if the '559 Patent is abstract, it nevertheless deserves patent protection because the "unconventional arrangement of processing in a network architecture . . . plausibly includes an inventive concept." (Id. at 19.)

As described above, the first question is whether the claims of the '559 Patent are directed to an abstract idea.  Defendant argues that the '559 Patent is directed to the abstract idea of controlling the flow of content based on information about the device and user and fails to present "any technical detail or enhancement underlying it." (Doc. No. 16 at 22.)  However, at this stage, Plaintiffs have sufficiently pled that the '559 Patent improved on previous network architecture and improved the functioning of computers.  As Plaintiffs argue, the '559 Patent is analogous to the claims in SRI because the Patent departed from the normal and expected operation of a conventional computer network.  That is because "Claim 1 [of the '559 Patent] uses an intermediate content flow manager server to analyze the status information from terminals and content sources to provide benefits to consumers and content providers in the management of content." (Doc. No. 18 at 17.)  The status information that is shared includes information about the capabilities of the device which allows content to be shared more efficiently.  This technique departs from the conventional "pull" technique used to access content prior to the invention of the '559 Patent.  (Id.)  For these reasons, Claim 1 of the '559 Patent satisfy step one of the Alice framework and is patent-eligible.

As noted above, because Claim 1 of the '559 Patent is not directed to patent-ineligible subject matter and satisfies the first step in the <u>Alice</u> framework, the Court need not reach the second step.  See <u>Core Wireless 15 Licensing S.A.R.L.</u>, 880 F.3d at 1361.   Therefore, Defendant's Partial Motion to Dismiss Count II relating to the '559 Patent will be denied.

### C.  The '794 Patent is Eligible for Protection Under 35 U.S.C. § 101

In the Partial Motion to Dismiss the Amended Complaint, Defendant also argues that the '794 Patent is patent-ineligible because it fails both steps of <u>Alice</u>.  (Doc. No. 16 at 24-25.)  First, Defendant claims that the '794 Patent is ineligible for patent protection under step one of <u>Alice</u> because it is directed at the abstract idea of transmitting data in a synchronized fashion.  (<u>Id.</u> at 23.)  Second, Defendant argues that the '794 Patent is ineligible for patent protection under step two of <u>Alice</u> because it simply recites generic claims and "does not provide significantly more to transform the abstract idea into a patent eligible application."  (<u>Id.</u> at 25.)

Plaintiffs disagree, arguing that the '794 Patent is eligible for patent protection under both <u>Alice</u> steps.  (Doc. No. 18 at 22-25.)  First, Plaintiffs assert that the '794 Patent is not directed to an abstract idea because it provides an improvement to computer functioning.  (<u>Id.</u> at 23.)  Second, even if the '794 Patent is abstract, it nevertheless deserves patent protection because its "unconventional use of assignment rules that are not based on timestamps . . . provides technical benefits over prior art."  (<u>Id.</u> at 25.)

Courts have held that claims directed to the improvement of an existing technological process are not abstract.  Such was the case in <u>Koninklijke KPN N.V. v. Gemalto M2M GmbH,</u> in which the court held that a patent was not abstract because it was directed to the improvement of an existing technological process.  942 F.3d 1143, 1150 (Fed. Cir. 2019).  There, the patent took an existing functionality and improved it with a process that applied modifications to the original data.  This is similar to the '794 Patent because it takes an existing process, the existing ordering

and aligning of data segments for playback, and improves it by using assignment rules that interrelate the segments rather than rely on timestamps.  Further, the '794 Patent does not, as Defendant claims, merely automate a sequence of known steps using conventional technologies. Instead, the '794 Patent describes a new technique for ordering and aligning audio segments that is more efficient than prior techniques.  Techniques that relied on aligning audio segments with timestamps would require each segment of content to include metadata that would indicate when in the timeline of the content the segment should be played.  (Doc. No. 11 at 20.)  Once a segment was downloaded, the metadata would have to be decoded and then additional processing would be needed to order the segment within the entire content file.  (Id.)  This made the existing technique slow and resource intensive.  (Id.)  The '794 Patent describes a different technique where segments of content were not assigned based on timestamps but instead use flexible and predefined assignment rules that were "not based on timestamps, but instead dictate[d] the relationships between the segments themselves without reference to absolute times."  (Doc. No. 18 at 21.)  "By creating relationships between segments, these assignment rules enable quick and efficient alignment of segment files without needing to access timestamps."  (Id. at 21-22.)  For these reasons, Claim 1 of the '794 Patent satisfies step one of the Alice framework at this stage and is patent-eligible.

As noted above, because Claim 1 of the '794 Patent is not directed to patent-ineligible subject matter and satisfies the first step in the Alice framework, the Court need not reach the second step.  See Core Wireless 15 Licensing S.A.R.L., 880 F.3d at 1361.   Therefore, Defendant's Partial Motion to Dismiss Count IV relating to the '794 Patent will be denied.

### D. Defendant's Motion to Dismiss Plaintiffs' Claims for Indirect and Willful Infringement Will be Denied

In the Partial Motion to Dismiss the Complaint, Defendant also argues that Plaintiffs' claims on each of the four (4) Counts for indirect and willful infringement should be dismissed because the Complaint does not adequately plead pre-suit knowledge.  (Doc. No. 16 at 26.)  The Court disagrees.

Indirect infringement claims "require proof that the defendant's conduct occurred after the defendant (1) knew of the existence of the asserted patent and (2) knew that a third party's acts constituted infringement of the patent."  ZapFraud, Inc. v. Barracuda Networks, Inc., 528 F. Supp. 3d 247, 249 (D. Del. 2021).  Claims based on willful infringement "similarly require proof that the defendant knew about the asserted patents and knew or should have known that its conduct amounted to infringement of those patents."  Id.  However, at the motion to dismiss stage, a plaintiff "need not 'prove its case at the pleading stage.'"  Nalco Co. v. Chem-Mod, LLC, 883 F.3d 1337, 1350 (Fed. Cir. 2018) (quoting In re Bill of Lading Transmission & Processing Sys. Pat. Litig., 681 F.3d 1323, 1339 (Fed. Cir. 2012)).  Instead, "[t]he complaint must place the 'potential infringer . . . on notice of what activity . . . is being accused of infringement.'"  Id. (quoting K-Tech Telecommunications, Inc. v. Time Warner Cable, Inc., 714 F.3d 1277, 1284 (Fed. Cir. 2013)).

Here, Plaintiffs adequately pled claims of willful and indirect infringement.  The Amended Complaint alleges that VideoLab and Netflix representatives spoke to each other on a number of occasions to discuss VideoLabs' platform and patents.  (Doc. No. 11 at ¶ 112.)  On October 22, 2019, VideoLabs first reached out to Netflix to provide information on the VideoLabs' platform.  (Id.)  At that time, Netflix did not respond.  (Id.)  On March 1, 2021, however, Netflix responded and agreed to have an introductory telephone conversation.

19

Importantly, in the Amended Complaint Plaintiffs allege that they provided Netflix with specific notice of the Patents in dispute here.   On February 22, 2022, Plaintiffs allege that VideoLabs sent an email to Netflix apprising it specifically of the '878, '790 and '559 Patents. (Id. at ¶¶ 112, 147, 175.)   In the email, Plaintiffs wrote:

> [A]lthough we are continuing to analyze Netflix's streaming service globally, we can confirm that we have acquired many patents relevant to Netflix and would still like to discuss some options for how Netflix can license these patents…Some examples of patents that we have confirmed are used by Netflix and provide it substantial value include:
>
> - U.S. Patent No. 8,139,878: used by Netflix to encode its content with H.264 CAVLC entropy encoding;
>
> - U.S. Patent No. 7,440,559: used by Netflix to control the flow of its video content to customers, such as with Netflix's Bookmarking, Smart Downloads, Skip Intro/Recap, and Autoplay features;
>
> - U.S. Patent No. 7,233,790: used by Netflix to present its video content catalogue to customers using a wide variety of devices.

(Doc. No. 11-50 at 2.)

Plaintiffs have also sufficiently alleged that Defendant had pre-suit knowledge of the '794 Patent through its involvement with developing the protocol Dynamic Adaptive Streaming over HTTP ("DASH").   DASH is a protocol for the delivery of content through online streaming.  (Doc. No. 11 at ¶ 65.)  Plaintiffs allege that the '794 Patent "is a core building block to these technologies, which has been recognized by the video technology industry."   (Id. at ¶ 66.)  Further, the '794 Patent is one of "10 U.S. patents that ha[s] been deemed essential to DASH" and "[n]umerous companies have taken a license to the '794 patent to obtain the right to use its technology to implement DASH."   (Id.)   The Amended Complaint alleges that Defendant was involved with creating the DASH standard and therefore knew about the '794 Patent and its relevance to its streaming platform.

These allegations, viewed in the light most favorable to Plaintiffs at this stage of the litigation, plausibly show that Defendant had pre-suit knowledge and for this reason the claims of indirect and willful infringement are sufficiently pled.

## V.       CONCLUSION

For the reasons stated above, Defendants' Partial Motion to Dismiss the Complaint (Doc. No. 15) will be denied.  An appropriate Order follows.